Galligher v. Connell.

THEODORE GALLIGHER, APPELLANT, V. WILLIAM J. CONNELL, APPELLEE.

1. **Forcible Entry and Detention**: PLEADING: EVIDENCE. The plea of "not guilty," in an action of forcible entry and detainer, requires the plaintiff to prove every fact necessary to entitle him to recover.

2. ———: ADVERSE POSSESSION. The building of a few rods of fence, the cutting of a few brush, or plowing of a few furrows upon land will not constitute such acts of possession as to entitle a party to maintain forcible entry and detainer against a tenant who has been in possession for more than one year under a written lease from one who claimed adversely to the plaintiff.

3. ———: JURISDICTION OF JUSTICE OF PEACE. While a justice of the peace cannot determine questions of title, yet he may receive deeds, in connection with other evidence, in order to show the right of either party to the possession of the premises.

4. ———: LANDLORD AND TENANT. A lessee or sublessee cannot, by surrendering his possession to an adverse party, deprive his landlord of his right to the possession of the premises. *Estabrook v. Hateroth*, 22 Neb., 281.

APPEAL from the district court of Douglas county. Heard below before HOPEWELL, J.

*C. A. Baldwin* and *Gregory & Smith*, for appellant, cited: *Goodenow v. Lichfield*, 59 Iowa, 266. *Kent v. Kent*, 2 Mass., 538. *Collins v. Jennings*, 42 Iowa, 447.

*James W. Savage*, for appellee, cited: *Strong v. State*, 4 N. E. Reporter, 293. *Dale v. Doddridge*, 9 Neb., 138.

MAXWELL, J.

The writer heard but a part of the argument in this case, but his associates heard it all, and agreed upon a decision reversing the judgment. The case was thereupon assigned to the writer to prepare an opinion, if, after an

examination of the record, he coincided with the views of his associates.

The action was brought before a justice of the peace, by Connell against Galligher, to recover the possession of the "east half of lot number five in Griffin & Smith's addition to the city of Omaha," upon the ground that, on the 15th day of April, 1885, the plaintiff was in the actual and peaceable possession of said premises, and on said day the said "defendant wrongfully and unlawfully entered upon the same, and with a strong hand did unlawfully and forcibly take possession thereof, and in like manner doth still detain the possession of such premises from said plaintiff." On the trial of the cause before the justice, judgment was rendered in favor of Connell. The case was taken on error to the district court, where the judgment of the justice was affirmed, and from that judgment Galligher brings the cause into this court.

It appears from the bill of exceptions that, in March, 1882, James E. North executed a lease to Galligher, as follows:

"This lease, made and entered into this first day of March, A.D. 1882, by and between James E. North, by his attorney and agent, Geo. M. O'Brien, of the first part, and Theodore Galligher of the second part, witnesseth: That the said party of the first part, in consideration of the rents, covenants, and agreements hereinafter contained, to be paid, kept, and performed by the said party of the second part, hath demised, leased, and let, and by these premises doth demise, lease, and let unto the said party of the second part $31\frac{1}{4}$ acres of ground, more or less, commencing at a point $15.56\frac{1}{4}$ chains north of the S. E. corner of the W. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 28, town 15, range 13 east, in Douglas county, Nebraska; thence north 14.78 chains; thence westerly 20.09 chains; thence south 16.35 chains; thence east 20 chains, to the place of beginning, for the term of one year, with the preference

of four years additional thereto. Notice of any change in terms by North to be given in writing, otherwise to be as stated for the full term. To have and to hold the same unto the said lessee for the term aforesaid. And the said Theodore Galligher, in consideration of the leasing aforesaid, doth hereby agree to pay as rent for said premises the sum of one dollar per year, and in addition thereto agrees to enclose the whole of said tract of $31\frac{1}{4}$ acres with a good and substantial fence, and put said land in a good state of cultivation, except the timber tract, which said timber shall not be cut, except for use of said premises, and shall also pay the taxes on said land that may accrue thereon, and shall plant a row of shade trees around on the east, south, and west boundaries thereof, eight feet apart. At the expiration of said lease said Galligher shall have the right to remove all buildings and fences from off said land belonging to him, or the said North the right to purchase the same, at an appraised valuation by disinterested appraisers; and should the said North desire to make any change in the terms of said lease, after the first year, the said Galligher to have 30 days' notice of the same. And the said Theodore Galligher further agrees that at the expiration of the terms above granted, or at an earlier termination of this lease, in case it should be sooner terminated, he will quietly and peaceably yield up possession of said premises unto the said James E. North, his agent or legal representative, in as good condition as the same were when entered upon, ordinary wear or damage by fire excepted. And it is further expressly agreed and understood by and between the parties hereto, that in case the rent above reserved, or any part thereof, be not paid at the time the same becomes due and payable, or in any other condition or agreement herein contained, on the part of the said Theodore Galligher, be not by said party fully complied with and performed, then and in that case the said James E. North, or his legal representatives, shall have

the right, at his option, to declare this lease at an end, and thereby cancel and annul the same, and retake immediate possession of said premises, and to put out and remove any person or persons occupying the same. Said Galligher not to let or underlet any part of said premises without the written consent of said lessor, or his legal representative, in writing.

"(Signed in duplicate.)

"JAMES E. NORTH,

"*By George M. O'Brien, his Agent and Attorney.*

"THEO. GALLIGHER.

"In presence of:
"E. M. BARTLETT,
"WALTER BENNETT."

This lease was duly acknowledged.

On the margin we find the following: "March 1, 1885. This written lease is hereby extended for all the land described therein to and until March 1, 1887, James E. North, by Geo. M. O'Brien, agent. Theodore Galligher."

On the back of this lease is an assignment of the interest of Gallagher in this lease to one Richard J. Colgin of "the two acres of land, more or less, situate in the south-east corner of the within described land, same being marked by some posts and wire in front, but open as a common. This sale and transfer is only of my leasehold interest and possession of said land according to the terms of the within lease."

This assignment is dated April 1, 1882. On the 8th day of April, 1882, Galligher assigned to Mary Colgin, the wife of Richard J. Colgin, "his leasehold interest therein, and the land therein described and known as the Housell tax title claim, except the two acres mentioned in the first assignment."

Mr. Galligher testified as a witness in his own behalf as follows:

Q. State who has been in actual use, occupancy, and

possession of that piece of property, the east half of lot five, during the last two or three years?

A. The date of the lease, what it is I don't know—whether it is March, 1882, or March, 1883, that land was leased to me—and I have got papers to show by. General O'Brien put me in possession.

Q. When?

A. The date of this lease. He put me in possession under this lease.

Q. At the time this paper bears date?

A. The lease was made out and signed, and he came to me and walked with me to the land and put me in possession.

Q. Now, then, tell the court whether from the time that you thus went into possession, what you have done towards possessing the property from that time to this?

A. Then there was a man by the name of Colgin that it was leased to.

Q. Who leased it to Colgin?

A. I did, under this lease.

Q. That was in writing?

A. Yes, sir; that was in writing.

Q. Is that endorsed here?

A. This is a copy. I guess it is on the original.

Q. You leased it to Colgin?

A. Yes, sir.

Q. And your lease is in writing?

A. Yes, sir.

Q. Well, then, how long did Colgin remain there?

A. He stayed there during the year 1882 and 1883, and a part of the year 1884; I think it was some time in February, the date of the contract between Colgin and myself.

Q. How long did Colgin remain there under you

A. Some two years and nine months.

Q. When would that bring it that he left?

A.    He left some time last October.

Q.    Now, then, since October who has been in the occupancy and possession of the premises?

A.    I have been on it, and done some work on it.

Q.    Tell the court whether somebody else has been in possession?

A.    Nobody that I know of; I never saw anybody.

Q.    Somebody has done some plowing on it?

A.    Yes, sir.

Q.    Now, during the last two years, tell the court whether or not you have seen anybody interfering with your possession, or Colgin under you, and on this land?

A.    Nobody has interfered with me, and nobody has interfered with Colgin, except this suit which Connell brought against Colgin, which I had a copy of in my pocket.

Q.    Now, what do you know about a fence on the west and south side? Do you know when they were built, and what do you know about their being built?

A.    .When Connell replevined this house from Colgin he paid some man to build this fence on the west of his land; it is not on his line at all.

Q.    The fence is not on this land?

A.    No, sir.

Q.    How is it about the fence on the north side?

A.    It is about the same, just enough to be on the land that he claims under replevin.

Q.    The fence that Mr. Connell put there is not on the line of this land?

A.    No, sir.

Q.    How is it about the fence on the south and east side?

A.    This is a board fence which Mr. Morton and myself helped to build. On the east side there was no fence until I built one this spring.

Q.    And what kind of fence is there now?

Galligher v. Connell.

A.   Four wire, smooth wire fence.

Q.   On the south side there is a board fence that you and Mr. Morton built?

A.   My man Colgin, I didn't do it myself, my man and Mr. Morton's man, it is all the same.

Q.   When was that built, about when?

A.   I don't know, but it was built just about a year ago.

Q.   You have told that you are there under lease from North; I ask you if you occupy the lots, and if this is the original lease?

A.   That is mine, I don't know whether this is the original lease or a copy; it is on record.

Defendant offers lease in evidence, which is received without objection.

Q.   Tell the court whether or not this lease, in the litigation of Peabody against Colgin and others in Justice Bartlett's court, was offered in evidence?

A.   It was.

Q.   And I ask you if in the suit of Housel & Co. against Colgin, in Justice Wright's court, it was offered in evidence?

A.   It was.

Q.   Who appeared as attorney for Peabody before Justice Bartlett?

A.   Mr. Connell.

Q.   And who appeared for Housel and Allen before Justice Wright's court?

A.   Mr. Connell.

Q.   Is that lease of record?

A.   Yes, sir.

Q.   What is that?

A.   This is a copy of Mr. Ijams' record, of judgment which Colgin obtained against Peadody.

Defendant offered in evidence the certificate of Mr. Ijams, clerk of the district court, showing that the case of

Peabody against Colgin has been dismissed. Received without objection.

Q.   When Mr. Colgin left, tell the court what he did, if anything, towards turning over possession of the premises to you?

A.   He came to me and told me that he was going to leave, and that the property was mine; that he would surrender the property to me, and he wanted me to take possession of it, and in the meantime he took some of my stuff; I picked up the stuff and some was up at the house of General O'Brien, who turned it over to me.

There is an extended cross-examination, which does not materially change the testimony of the witness above given. Galligher is substantially corroborated by the testimony of General O'Brien, and other witnesses.

On behalf of the plaintiff below, Mr. Connell testified as follows: "I am the plaintiff in this action, I know Mr. Galligher, the defendant ,and have known him for several years.   The piece of ground in controversy in this suit I am personally acquainted with, and have been familiar with it for ten years or more past; it is the east half of lot 5 in Griffin & Smith's addition to the city of Omaha, and lays in the south-western portion of the city of Omaha, in Douglas county, a short distance this side of the poor farm, and contains about two acres of ground.   The entire tract, a number of years ago, was lying open and unenclosed, the traveled road running over a portion of it.   In the year 1878 Judge Wm. L. Peabody took possession of the ground, which was then unoccupied, by erecting upon it a post and wire fence, placing new cedar posts about every nine feet and attaching to the posts three or four or five barbed wires (am unable to state to a certainty the number), and also set out within the enclosure several hundred trees, a number of which were subsequently destroyed by fire, a number of the trees still existing and growing on the place; a half lot to the west and two lots to the north,

being lots one and four of Griffin & Smith's addition, were taken possession of by Housel & Allen, who fenced it and erected a small house upon the east portion of lot four; the lots last referred to, one, four, and the west half of lot five, were subsequently sold by Housel & Allen to me. I have here a plat showing the several lots referred to, which I know to be correct, and which I offer in evidence in connection with my testimony. [Plat received without objection.] Mr. Peabody continued in possession of the half lot in controversy until sometime in the fall of 1883, when the lot was invaded and taken possession of by one Richard Colgin, who was formerly in possession of the other ground referred to, occupying the house of Housel & Allen; but upon judgment of restitution being entered against him, moved the house referred to upon the east half of Judge Peabody's lot; the house was subsequently replevined and removed back on lot four, but Colgin still left some things upon this east half of lot five. Shortly after this, Mr. Peabody wrote me, requesting—— the letter which Judge Peabody wrote me and which I have referred to, I have made search for in every place where it would be in existence, but have been unable to find it, and am satisfied it was destroyed. The contents of it, however, were, in substance, that as I had the other ground adjacent to this, the use of this would be of some benefit to me, and I or my tenants might derive some benefit from the cultivation of it; and in consideration for looking after it and taking care of the judge's interests, he wished me to hold and occupy and cultivate it to such an extent as I might be able to; this I proposed to do, and I arranged with my tenant, Mr. Rasmussen, to take possession of and cultivate it for me, and this Mr. Rasmussen was to do as my representative. I fenced the north and west side of a portion of the lot in controversy; on the south side was the fence that was there when Colgin occupied it; on the east side there was some old posts, and had been barbed wire; they were placed

there by Judge Peabody, but about the 21st of May, last year, I was notified by the city authorities, by a policeman, to remove the barbed wires (rather the notice was served by a policeman, it coming from the city marshal); that notice I have; afterwards I secured from Colgin whatever right of possession he had or claimed in the premises, by written document which I have and will offer in evidence. [Received without objection, marked exhibit "B."] I will further say that this paper executed after the replevying of the house, and after Colgin had deserted the premises and abandoned possession, was merely done as an adjustment to settle any possible future litigation that might arise between us concerning this or the other tract. From the time Judge Peabody put this fence around, in 1878, he continued the possession until Colgin moved this house upon it; I was familiar with the tract of land, and it remained with Peabody's trees growing there, and fence around it, until Colgin tore down a portion and moved this house that is referred to in the paper and took possession."

"Q.    When was that?

"A.    That was in 1883, except that prior to that it had been cultivated by Colgin under an arrangement with Allen, who then represented Peabody.    Mr. Galligher, the present defendant, I never saw there, or knew that he had anything to do with the property until he interfered with my tenants a few weeks ago.    I knew that he represented parties claiming adverse title, and that he occupied some of the lots to the west of all the property that I have referred, and is occupying that property now with the fence erected by Housel & Allen on their west line running between the property taken possession of by them and the property occupied by him, this fence being the width of this tract of ground, to the west of this tract.    The plat that I offered in evidence is in ink, the pencil marks upon it have been made by Mr. O'Brien, to which I make no objection, but will say, with regard to the pencil marks in-

dicated by him, that no such road has existed, as a matter of fact, since 1878, but the road runs east and west, parallel with the south line."

In his redirect examination he further testifies : "I wish to state further that during the winter past, no one was in actual occupancy of the ground in controversy, nor was any one in actual occupancy until my tenants commenced to plow this spring.

"Q. Who raised a crop on it last year?

"A. There was no crop raised last year. Colgin, in the spring of the year, planted something there, but after the house was replevined the ground remained open, and I then exercised the right of ownership, and having control of the premises I removed the barb wires and nothing was taken from the ground in the fall of the year.

"Q. How did you exercise the right of ownership—mentally, or did you do it physically?

"A. I exercised it physically, by having some brush cut.

"Q. When?

"A. Last fall.

"Q. About how much, a whip?

"A. I had my hand commence with an axe to cut it out, and intended to have him complete it all, but other work prevented the completion of the work.

"Q. How much work did he do?

"A. He cut down some of the sumacs and took down some wires.

"Q. Is there any sumac on this ground, on the east half of lot five?

"A. There is some along the edges.

"Q. Isn't this sumac on your other property west of this lot?

"A. Yes, there is more along the west side than any other point."

The writing which Mr. Connell received from Colgin

is as follows: "In consideration of the sum of one hundred dollars, to us in hand paid, we do hereby acknowledge full settlement and satisfaction of all claims and demands of whatsoever nature against W. J. Connell, or any person acting under him or for him, or arising or growing out of the replevin of a certain house formerly occupied by the parties hereto and below named, or in any manner relating to or concerning the use or occupation of the property herein described. And in consideration of the sum aforesaid, we release and turn over to said Connell all possession, or right to possession, we, or either of us, may have to the following described real estate, situate in Douglas county, state of Nebraska, to wit: lots one (1), four (4), and lot five (5) in Griffin & Smith's addition to the city of Omaha.

"Dated Omaha Neb., June 14, 1884.

"Witness:                              R. Colgin,
    "D. L. McGuckin.              Mary Colgin."

Mr. Connell, in his argument in the case, stated that in the course of the proceedings he caused Mr. Colgin to be put in jail, and that one of the objects of paying this money and obtaining the release was to prevent the possibility of an action for damages. Mr. Connell also introduced a copy of a notice from the city marshal of Omaha, requiring him to remove the barb wire from the half lot in question, and proof of a compliance with the notice. He also introduced proof showing that in the winter previous to the bringing of the action he had caused a small quantity of brush to be cut on said half lot and, on the day in which he is alleged to have been in possession, he procured the plowing of a part of said lot. Upon the facts thus shown, can Mr. Connell maintain the action? We think not.

Section 1,019 of the code provides that, "Any justice, within his proper county, shall have power to inquire, in the manner hereinafter directed, as well against those who make unlawful and forcible entry into lands and tenements, and detain the same, as against those who, having a law-

ful and peaceable entry into lands or tenements unlawfully and by force hold the same; and if it be found upon such inquiry that an unlawful and forcible entry has been made, and that the same lands or tenements are held by force, or that the same, after a lawful entry, are held unlawfully, then said justice shall cause the party complaining to have restitution thereof."

The action of forcible entry and detainer in this state is a civil remedy, although to some extent criminal in form; thus the plea of not guilty shifts upon the plaintiff the burden of proof, and requires him to establish every material fact on which his right to recover depends. This includes the statute of limitations. At common law the limitation was fixed at three years, but our statute limits the time within which an action must be brought to one year. The testimony in this case shows that Galligher and his subtenant, Colgin, had been in possession of the premises in question three years when this action was brought. It is claimed, however, that the rights of Mr. Connell date from the time of his alleged possession by cutting brush in the winter of 1884 and 1885, and by the plowing which he caused to be done in the spring of 1885. But such acts will not of themselves create a lawful possession. So far as this record discloses, the entry of Mr. Connell thereon was unlawful and forcible, even if it is admitted that he was acting under Peabody. There is no evidence tending to show that Peabody had any title to the half lot in controversy. If he had such title, evidence of it should have been introduced. A justice of the peace, while precluded from acting where the title is in dispute, has authority to receive deeds or other evidences of title to show the right of either party to the possession. In this case, however, so far as appears, Mr. Peabody was a trespasser when he erected the fence in 1878, referred to in the testimony. It is difficult to perceive, therefore, in what manner Mr. Connell could derive any rights from

Peabody's claim to the lot in question.    We do not under-stand Mr. Connell to claim as a sublessee of Colgin, if so he could not deny the title of his landlord, Mr. North. If it is claimed that Colgin surrendered the possession of the premises to the plaintiff below, such surrender would be unavailing as beyond the power of the subtenant.    In *Estabrook v. Hateroth*, 22 Neb., 281, a tenant, upon va-cating a building, surrendered the key to one claiming an adverse interest, and it was held that this did not divest the right of the landlord to the possession of the premises; and we adhere to that decision.

The judgment of the district court is reversed, and .the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.